# CHARLESTON.

ZUPLKOFF V. CHARLESTON NATIONAL BANK.

Submitted February 8, 1916. Decided February 22, 1916.

1. BANKS AND BANKING—*Duty of Bank—Rights of Depositor—Payment to Wrong Person.*

    The defendant bank adopted the following rules and regulations, applicable to its savings department:

    ''4. Deposits and the interest thereon may be withdrawn by the depositor in person or by written order; but in either case the pass book must be presented, that such payments may be entered therein. As officers of the bank may be unable to identify every depositor, the bank will not be responsible for loss sustained where a depositor has not given notice of his or her book being lost or stolen, if such book be paid in whole or part on presentation. In all cases a payment upon presentation of a deposit book shall be a discharge to the bank for the amount so paid.

    ''5. The amounts that may be due upon accounts shall be payable only to the depositor, his or her order or to his or her legal representatives, and in case of minors or married women, without regard to parents, guardians or husbands, as provided by law.

    ''6. Depositors, on signing the signature card thereby agree and assent to these rules and regulations which may be altered and amended at any time by the board of directors, and all such altered or amended rules shall be obligatory and binding on depositors after due notice of the same.''

    These rules were assented to and signed by the plaintiff, who was a depositor. *Held:* That notwithstanding these rules and the contract relations created thereby, the bank is bound to exercise reasonable care in making payment so that payment shall be made to the person entitled to receive the money, and if the bank pay the money to the wrong person, without exercising reasonable care, this will not be a discharge to the bank as against the depositor. (p. 622).

2. SAME—*Action by Depositor—Defense—Reasonable Care—Question for Jury.*

    Where a depositor in a savings bank which has adopted the rules stated in the foregoing syllabus, seeks to recover money on a deposit

made by him in such bank, and the bank defends on the ground that the money had been paid to a person holding the depositor's pass book, and that no notice had been given the bank before such payment that the book had been stolen or lost, and the evidence is conflicting and contradictory as to whether the bank used reasonable care in ascertaining whether or not the person who presented the book was the owner or entitled to receive the money, before paying the same, this would make a proper case for a jury to determine whether or not under all the circumstances the bank had exercised reasonable care. Such questions should be decided by the jury and not by the court. (p. 630).

3. APPEAL AND ERROR—*Verdict—Conflicting Evidence.*

To justify setting aside a verdict in a case involving conflicting oral evidence, on the ground alone that the verdict is plainly against the decided weight and preponderance of conflicting evidence, the court must go beyond the question of the credibility of the witnesses who gave conflicting oral evidence in the presence of the jury, and find documentary evidence, facts or circumstances, or some of these, which when considered with such conflicting oral evidence plainly constitute a decided weight and preponderance of evidence against the verdict. (p. 635).

4. SAME—*Judgment on Appeal—Rendition.*

Where the circuit court sets' aside a verdict of a jury on the ground that it is contrary to the law and the evidence, and it appears that the action of the court in setting aside the verdict was plainly wrong, this court will reverse such judgment and enter judgment in this court upon the verdict. (p. 635).

Error to Circuit Court, Kanawha County.

Action by Tpuropin Zuplkoff against the Charleston National Bank. Judgment for defendant, and plaintiff brings error.

*Reversed and rendered.*

*Loeb & Kenna* and *Cato & Bledsoe,* for plaintiff in error.

*S. S. Green* and *A. M. Pritchard,* for defendant in error.

MASON, JUDGE:

The defendant, the Charleston National Bank, is a corporation, doing business in the city of Charleston, W. Va., as a National Bank, organized under the Acts of Congress, and operating a savings department in connection with its other banking business. It adopted certain rules and regulations

for the government and control of its savings department. The rules involved in this suit are as follows:

Rule 3. "As it will be necessary to loan out the funds of the bank in order to pay interest, depositors may be required to give sixty days notice before withdrawing their deposits, but as a general rule they will be permitted to withdraw them at their pleasure."

Rule 4. "Deposits and the interest thereon may be withdrawn by the depositor in person or by written order; but in either case the pass book must be presented, that such payments may be entered therein. As officers of the bank may be unable to identify every depositor, the bank will not be responsible for loss sustained where a depositor has not given notice of his or her book being lost or stolen, if such book be paid in whole or part on presentation. In all cases a payment upon presentation of a deposit book shall be a discharge to the bank for amount so paid."

Rule 5. "The amounts that may be due upon accounts shall be payable only to the depositor, his or her order or to his or her legal representatives, and in case of minors or married women, without regard to parents, guardians or husbands, as provided by law."

Rule 6. "Depositors, on signing the signature card thereby agree and assent to these rules and regulations which may be altered and amended at any time by the board of directors, and all such altered or amended rules shall be obligatory and binding on depositors after due notice of the same."

On the 13th day of June, 1910, the plaintiff opened an account with the bank and began doing business with it, in the savings department, by depositing $500.00, and receiving from the bank a pass or deposit book, in which was entered as a credit said sum of $500.00, and in which were also the rules and regulations to govern and bind him and the bank. At the same time the plaintiff signed a "signature card", and thereby agreed to and assented to the rules, as provided in Rule 6. On said card there were also certain questions and answers, stating: "No. 1611. I hereby agree to the By-Laws and Regulations. The Charleston National Bank, Charleston, W. Va. Signature, Tpuropin Zuplkoff. Residence, Cedar Grove, W. Va. Occupation, Miner. Age, 25.

Birthplace, Russia. Name of Husband, ————. Name of Wife, Single,'' These question are referred to in the proceedings as "test questions".

April 15, 1911, plaintiff deposited $50.00; Jan. 2, 1912, $22.00; Dec. 31, 1912, $16.00. The deposits were to bear interest at the rate of three per cent, to be paid semi-annually. On the 1st day of January, 1913, the deposits and the interest as claimed by the plaintiff amounted to $629.78. All these deposits were made by plaintiff in person. On the 31st day of December, 1912, when the plaintiff took his book to the bank to make a deposit and to have the interest credited, he was informed that $450.00 of the money deposited by him had been withdrawn on the 9th day of May, 1912. The plaintiff says he did not receive this money, and did not know that it had been withdrawn until informed by an officer of the bank that day. This $450.00 is the subject of the controversy in this case.

The undisputed facts in relation to the payment of the $450.00, are that on the 9th day of May, 1912, a man representing himself to be the plaintiff, presented the plaintiff's pass book at the bank and demanded $450.00. A. M. Pritchard, president of the bank, and J. D. Foster, the cashier, were in the bank when the pass book was presented and the money demanded. Mr. Pritchard was in the "teller's cage" and received the book from the person presenting it. His deposition was taken, and he states in detail what occurred between him and the person presenting the book. He says: "I took the book and looked at the balance, and saw that he had more than the amount demanded. Four hundred and fifty dollars was, I think, the amount demanded. I then compared the book with the card—we use a card system for carrying these savings accounts—saw that they compared, and I then took one of our blanks and filled it out for the sum of $450.00, and handed it to the party and told him to sign his name to it; he did so and handed it back to me; I immediately turned to the signature card file, and took out the signature card for this account, and placed the card and the check or order which had been signed as I have explained, together, and compared them. There were slight variations, although to my mind, the slant and general characteristics

of the handwriting were very similar, if not identical, but
inasmuch as I had not been in the bank so long, and had not
the experience of Mr. Foster, the experience that he had had,
I called him into consultation, and we both compared the
card and the check, and it was suggested—both of us think-
ing that it was all right, that for additional protection we
ask the test questions on the back of the card, all of which was
done. I remember comparing the signature on the back of the
check with the signature at the foot of the check, both of
which had been written within a few minutes of each other;
and to my mind there appeared quite as many differences
between the two signatures on the check, as there was between
either of said signatures and the signature on the card, and
noticing a characteristic at the end of the signature on the
card, which did not appear at the signature at the bottom of
the check, after the signature had been written on the back
of the check, there appeared some sort of a character at the
end of the signature, which I took to mean an endeavor to
affect the character at the end of the name on the card, leading
me to believe that it was genuine, for the reason that possibly
no two people ever sign their names exactly the same." Mr.
Pritchard says he saw the man who presented the book, sign
the check and endorse it, that the latter represented himself
to be the party to whose credit the amount on the book stood,
and that he paid the $450.00 to the drawer of the check and
returned the pass book to him. He also says that he did not
require anyone known to the bank personally to identify
the man, because the latter said that he did not know anyone
in the city.

Mr. Foster, also examined as a witness for the bank, said:
"I wasn't at the counter when the book was presented. I
was outside of the teller's cage, and the book was presented,
and the request for the payment of $450.00—Well, the first
I knew of it, Mr. Pritchard,—A. M. Pritchard, who was in
the teller's cage, brought this book and a check and the signa-
nature card we had here on yesterday, and asked me what
I thought of the signature signed to the check; that is, as
to whether it was correct or not, and at the same time handed
me the signature card. As near as I can remember, we—I
told him that there appeared to be some difference in the

signature at the bottom of the check, where they are usually signed. Then I suggested that he ask the party the questions, the answers to which would be found on the card, and this Mr. Pritchard did. Then I suggested to him, after these were answered properly, to have the party write his name on the back of the check, and this was done, and the check was handed in, and the signature looked enough alike—enough alike the original signature that we had on the card, to cause me to believe that the party presenting the book and demanding the $450.00 was the party entitled to the money. I would not know the plaintiff personally. The signature card bears the signature of the depositor and also contains other information, from which questions may be asked the depositor, and if those questions are correctly answered, in accordance with the information on the card, we allow that to have a bearing upon our action in cashing or withholding the payment of the check.''

And thereupon $450.00 was paid to the man making the demand, entry of this withdrawal was made on the pass book, and the book then returned to the person who presented it.

The bank offered to pay the plaintiff $166.28, which it claims was the balance coming to him after paying the $450.00. The plaintiff refused to accept this sum, insisting on payment of the whole amount, and made a formal demand on February 27th or 28th, 1913, for $629.78, which was refused; and this suit was brought to collect the same. The defendant pleaded non-assumpsit, and three special pleas; the first setting up the $450.00 above referred to as part payment, the second tendering $166.28, balance due; and in the third it is alleged that the defendant paid $450.00 to a person holding at the time the plaintiff's pass book, in good faith and with the belief that the person presenting the pass book and demanding payment was the plaintiff. The plaintiff accepted the $166.28 in part satisfaction of his demand, and issues were thereupon made up. The plaintiff tendered a special replication to defendant's special plea No. 3, which the court refused to allow filed. No defects in the pleadings claimed by the parties are pressed here, except the contention of the defendant that the suit was prematurely brought, and this is without merit. When the controversy

arose betwen the plaintiff and the defendant, over the $450.00, the defendant offered to pay the plaintiff the balance of $166.28. There was no question as to the $166.28 on the part of the defendant, and none is raised by the pleadings. Under the circumstances no formal demand was necessary.

This case presents some novel and important questions not heretofore passed upon by this court, although they have been the subject of frequent adjudication in other states. The liability of a bank to its depositors in its savings department differs very considerably from its liability to its depositors in other branches of its business. Generally banks adopt rules and regulations relating to receiving and paying out money on deposits in its savings departments. As has been stated, the defendant bank in the case at bar had adopted such rules. It is important to know to what extent and under what circumstances these rules are binding upon the depositor. Deposits of this kind are not subject to check, and most of the depositors are seen but occasionally at the bank. They are usually quite numerous; rendering identification more difficult than in cases of ordinary banks. Hence by agreement between the bank and its depositors, reasonable rules and regulations may be adopted for the protection of both the depositors and the bank. Such rules, when reasonable and assented to by the depositor, are upheld by the courts, where there is no negligence on the part of the bank.

The adjudicated cases uniformly hold that in case of a savings bank, or a bank having a savings department, by-laws requiring presentation of the pass book and notice to the bank in case of loss as conditions precedent to payment, are reasonable, and when brought to the notice of the depositor, become part of the contract between the bank and the depositor. But it is quite as uniformly held that notwithstanding those contract relations, the bank is bound to exercise good faith and reasonable care in making payment so that payment shall be made to the person entitled to receive it. This is so because the bank cannot make a contract by which it relieves itself of responsibility to the extent that it may carelessly or negligently pay to one who has come into possession of the pass book fraudulently or criminally. Ref-

erence to some authorities upon this subject may be useful at this point.

"A by-law of a savings bank, that it will not be responsible for loss sustained by the payment of a book on presentation when the depositor has not given notice of his book's being lost or stolen, does not relieve the bank from the duty of exercising good faith and due care." *Brown* v. *Merrimac River Sav. Bank,* 67 N. H. 549; 68 A. S. R. 700.

"A rule of a savings bank that the institution will not be responsible for loss sustained by payment to a stranger, when the depositor has not given notice of loss of his book, since the officers of the institution may be unable to identify every depositor transacting business at the bank, does not relieve the officers of the bank from the exercise of reasonable care to protect the interests of the depositors, and prevent loss to him by payment to a person not entitled to it." *Ladd* v. *Augusta Sav. Bank* (Me.), 58 L. R. A. 388.

"It seems that the rules prescribed by a savings bank for its protection in the payment of deposits, do not dispense with the exercise of ordinary care upon the part of its officers, and if, by a custom or regulation adopted by it, designed to prevent fraud, a fact is brought to the knowledge of such officers, calculated to excite suspicion and inquiry on the part of an ordinarily careful person, a failure to institute such inquiry is negligence for which the bank is liable." *Appleby* v. *Erie County Sav. Bank,* 62 N. Y. Rep. 12.

"That the signature to the receipt by one receiving payment of a savings bank deposit did not seem exactly right to the bank officials is sufficient to make a question for the jury as to negligence in paying over the money to him, especially where the genuine and forged signatures are both in evidence.

"Active vigilance to detect fraud and forgery is due by savings bank officers to a depositor on paying the deposit to one presenting the pass-book, although the by-laws provide that the bank will not be responsible for fraud in presenting the bank-book and drawing the money, where they also require its presentation by the owner or his agent duly constituted by a writing signed and acknowledged, as a condition

of payment." *Kummel* v. *Germania Sav. Bank,* (N. Y. Ct. of App.), 13 L. R. A. 786.

"A regulation requiring written notice to be given at least thirty days previous to the withdrawal of savings deposits, is not solely for the benefit of the bank, but is intended also to protect the depositor against fraud or forgery.

"A savings deposit having been paid without such notice to a person presenting the pass-book and fraudulently personating the depositor, it is *held,* upon the evidence, that it was a question. for the jury whether the officers of the bank were negligent." *Wegner* v. *The Second Ward Sav. Bank,* 76 Wis. 242.

"By-laws of a savings bank, which require the presentation of the deposit book, or due notice to the bank in case of loss of the book, as conditions precedent to payment to the depositor, or upon his written order, are reasonable conditions and become a part of the contract between the bank and the depositor, when brought to the notice of the latter.

"When in such case the bank makes payment on presentation of the deposit or pass-book, and not to the depositor in person, but upon what purports to be a written order by him and which turns out to be a forgery, the bank is at least bound to act in good faith and to exercise reasonable care with the view to avoid payment to a person who is not lawfully entitled to receive payment; and if in such case it does not so act in good faith and exercise reasonable care, it will be liable to pay again to the rightful owner of the deposit." *The Hough Ave. Sav. Bank* v. *Anderson.* 78 Ohio St. 341.

"The by-laws or rules of savings banks usually contain a provision intended to protect the bank from liability for payments made to one who has wrongfully obtained possession of, and who presents at the bank a pass-book belonging to a depositor, and it is customary to print such rules in the passbook. While these by-laws and rules are somewhat variant in phraseology, there is in substance and legal effect much similarity between them. One of these by-laws or rules that is commonly printed in the passbook provides that all payments to persons producing the passbook shall be valid payments to discharge the, bank. It has been held that such a by-law or rule, or one of similar import, will not prevent

a recovery by a depositor whose passbook has been stolen, or obtained from him by fraud, and the deposit is wholly or in part withdrawn, unless the bank used ordinary care in making the payment." 3 Michie on Banks and Banking, sec. 301 (4).

Many authorities might be added to the above, all to the same effect, but those cited are deemed sufficient to elucidate the law. We are of opinion that under the law, notwithstanding the provisions of Rules 4, 5, & 6, it was the duty of the bank, when the pass book was presented to it by a stranger and the sum of $450.00 demanded, to use reasonable care to ascertain whether or not the person presenting it and demanding payment was the owner of the book. The officers of the bank recognized this duty, and the suspicion of the officers having been aroused, made some effort to discover whether the person presenting the book was the owner. What was done by the officers of the bank at the time has already been stated. Neither the president nor the cashier knew the man who presented the book; neither knew the depositor. They excused the person presenting the book having himself personally identified, for the reason that he said there was no one in Charleston who knew him. They relied upon other means of identification. It appears that they were deceived. The proof upon the trial shows very clearly that the man who got the money was not the depositor. There is evidence tending to show that the owner of the book was at home the day the book was presented and the money paid, and could not have been in Charleston.

The evidence does not show who the man was that presented the pass book to the bank and got the $450.00. It is shown that plaintiff was a single man—a Russian; that he was a coal miner; that at the time the money was taken he was rooming with a Polander by the name of Walter Karashkewitch; and that the next day after the money was drawn, Karashkewitch left Ward and has never returned, and his whereabouts since then are unknown. The plaintiff suspicioned this man.

This brings us to the question of whether or not the bank officers exercised proper or reasonable care and diligence in paying the $450.00. In addition to the statements of the

president and the cashier of the bank, the pass book, the original "signature card", with the depositor's name signed thereto, and the check signed at the bottom and endorsed on the back, were in evidence and examined by the jury. These signatures were compared by the officers of the bank when the demand for the money was made, and from a comparison of the signatures, the answers to the "test questions", and the possession of the book, and no notice that the book had been lost by the depositor, the officers of the bank reached the conclusion that the man who produced the book was the owner. Did the officers of the bank use reasonable care? Could they have discovered by a more careful inspection of these signatures that they were not made by the same person; that is, that the person who signed the check in their presence was not the person who signed the "signature card"; and should they not have required a personal identification?

W. B. Wilkinson, who is a general bookkeeper in the Kanawha National Bank, was examined as a witness for the defendant. The identification card and the check were shown to him. He compared the signatures, and said there were points of general resemblance and similarity, and that there were some points of difference in the signatures. Rule 4 was read to the witness and the following hypothetical question asked him: "If a person unknown to the bank, came into the bank with the customer's pass book, and representing himself to be the customer, and demand payment of a portion of the funds deposited in the savings department to the credit of the customer, and draw a check, or order in the bank, in the presence of the bank officers, and sign the customer's name, and endorse his name, being the same check that is exhibited in the evidence here, which you have examined, and answer the questions correctly upon the signature card, the signature card which you have examined in the case, with the name of the customer in his own handwriting upon that card, and telling the bank, when asked for identification, that he knew nobody in the town to identify him to the bank, and had no other means, or extraneous means of identifying him, and had no extraneous reasons for believing that the man presenting the book, and demanding the payment, was not the true claimant and true depositor, and the bank had no notice

or knowledge that the customer's book had been lost or stolen, and the true depositor was not known to the bank officers, would you as a banker, in the exercise of reasonable care, pay that check?" He answered that he would have paid the check. Mr. Wilkinson's attention was called to some of the letters in the different signatures, and he concluded that he would have paid the check.

C. Riggs, another witness in behalf of defendant, who was assistant cashier in defendant's bank, was examined and the same hypothetical question was propounded to him which was propounded to Mr. Wilkinson. He said that under the circumstances he would have paid the check, and have been in the exercise of reasonable care. This witness pointed out some differences in the signatures.

J. W. Crider, another witness for the defendant, was examined. He was assistant cashier of the Kanawha Valley Bank. Rule 4 was read to him, and the same hypothetical question was propounded to him as to the others, and in reply he said that he would have paid the check under the conditions stated. On Cross-examination this witness pointed out differences in the signatures on the card and the check; and after comparing the signatures he pointed out that the signature at the bottom of the check and the one on the signature card were not spelled alike—that one is spelled with eight letters and the other with seven; and after examining the signatures with a glass, he said that the signature at the bottom of the check and the one on the "signature card" were not written by the same person.

H. P. Brightwell, cashier of the Union Trust Co., was examined as a witness for the plaintiff. He was of opinion that the signature at the bottom of the check and the signature on the "signature card" were not written by the same person. He said: "I don't think they look very much alike." He was then propounded this hypothetical question: "Mr. Brightwell, if a depositor—assuming that you were an official of a bank that has a saving department, and that a person unknown to you came to your bank and deposited the sum of $500.00 in the savings department, and thereupon received a pass book, similar to the book in evidence here in this case marked Defendant's Exhibit No. 1, and which I now hand

you for examination, that he afterwards came to your bank and made several other deposits, amounting to something between $500.00 and $600.00, close to $600.00, a person to you unknown, or unknown to anyone in your bank, came into the bank and presented the check which you have in your hand, marked Defendant's Exhibit No. 3, and demanded the sum of $450.00 thereon, from this account; and assuming that at the time the deposit was taken, and the account opened, you had had the depositor sign the identification card in evidence here, as Defendant's Exhibit No. 2; that you compared the signature on the check and the signature on the identification card, would you in view of the physical comparison between those two signatures, as an ordinary prudent banker, have been satisfied with having the person presenting the check, sign his name again upon the back, and with having him correctly answer the questions on the identification card, to-wit: That his residence was Cedar Grove, West Virginia, that his birthplace was Russia, that he was single, that his age was 25, or would you have required him to secure personal identification, or to have his signature guaranteed; assuming, also, that you had received no notice from the depositor, that his pass book had been stolen, as required by Rule 4 in said book?" The witness answered: "I would have required identification."

E. M. Craig, who has been employed in banks for 20 odd years, was examined as a witness for the plaintiff. He was shown the check and asked to examine the signature at the bottom, and was handed the "signature card" and asked to compare the signatures and to say whether the signature on the check was by the same person as the signature on the identification card, or was a forgery of that signature; to which he replied, "I pronounce it a forgery." He said the discrepancy would be clearly evident at first examination by an experienced bank official.

David A. Jayne, a certified public accountant, was examined as a witness for the plaintiff. He was handed the "signature card" and asked to examine the signature, and was also handed the check and asked to examine the signature at the bottom of the check and to compare the signatures and say whether or not in his opinion the signature at the bottom

of the check is the genuine signature of the person who signed the identification card. He replied: "In my opinion it is not the signature, and therefore must be a forgery."

It cannot be doubted that under the facts and circumstances of this case, the questions presented are questions for a jury. It is not the province of this court to determine the weight and effect of the circumstances brought to the attention of the defendant officers at the time the money was paid, nor to point out the inferences which a prudent man might be expected to draw from them. All that it is proper for us to say is that they were of such character as to require their submission to a jury. "The trial court rightly declined to instruct the jury as to the effect upon the question of defendant's negligence of the particular facts referred to in the fourth request. The question was one of reasonable care under all the circumstances, and these facts with others, were properly left to the consideration of the jury in determining whether the defendant had exercised that degree of care." *Chase* v. *Waterbury Sav. Bank*, (Conn.), 69 L. R. A. 340. "In this case if the two signatures were so dissimilar as when compared the discrepancy would be easily and readily discovered by a person competent for the position, then the failure to discover it would be evidence of negligence which should have been passed upon by the jury. It would not be evidence of negligence if the difference was not marked and apparent, or if it would require a critical examination to detect it, and especially if the discrepancy was one to which competent persons might honestly differ in opinion." *Appleby* v. *Erie County Sav. Bank*, *supra.*

Without burdening this opinion with additional authorities it may be said that where a depositor seeks to charge a savings bank with negligently paying money belonging to the depositor, to another, wrongfully, and there is testimony tending to sustain each, this makes a case proper to be submitted to a jury to say whether in view of all the facts and circumstances attending the transaction the officers of the bank exercised reasonable care and diligence to identify the person to whom the money was paid.

The case was submitted to the jury; and there was a verdict for the plaintiff for $481.71. The defendant moved to

set aside the verdict as being contrary to the law and the evidence and award it a new trial.  This motion was sustained and the verdict set aside, to which the plaintiff excepted, and brought the case to this court for review.

Did the circuit court err in setting aside the verdict? We are clearly of opinion that it did.  The rule is now well settled in this state, that "a new trial will not be allowed in a case in which only issues of simple fact were raised, dependent upon conflicting oral evidence, thus making the credibility of witnesses an important factor in the case, merely because the verdict is contrary to an excess in the quantum of such evidence, there being direct and positive evidence to sustain it, and no controlling physical, admitted or established, facts with which it is inconsistent." *Fulton* v. *Crosby & Beckley Company*, 57 W. Va. 91.  "To justify setting aside a verdict in a case involving conflicting oral evidence, on the ground alone that the verdict is plainly against the decided weight and preponderance of conflicting evidence, the court must go beyond the question of the credibility of the witnesses who gave conflicting oral evidence in the presence of the jury, and find documentary evidence, uncontroverted evidence, facts or circumstances, or some of these, which when considered with such conflicting oral evidence plainly constitute a decided weight and preponderance of evidence against the verdict." *Coalmer* v. *Barrett*, 61 W. Va. 237.

We reverse the judgment of the circuit court and enter judgment in this court on the verdict for the plaintiff.

*Reversed and rendered.*