Tribulas, Appellant, *v.* Continental Equitable
Title and Trust Company.

Argued December 7, 1937; reargued May 19, 1938.
Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN,
STERN and BARNES, JJ.

284

*J. George Lipsius,* for appellant.

*John Kennedy Ewing, 3rd,* of *Saul, Ewing, Remick & Saul,* for appellee.

OPINION BY MR. JUSTICE LINN, June 30, 1938:

This suit in assumpsit was brought April 16, 1936, against Continental Equitable Title & Trust Co., which, at the time of the transactions to be considered, had been engaged in commercial banking. It had received savings funds as well as general commercial accounts. The plaintiff sued for $11,533.73 with interest from June 24, 1931, averring that in prior years she had made deposits aggregating the sum of $12,000 and had received from the bank only $466.27. The 5th paragraph of the statement of claim is: "Plaintiff avers that all moneys [except $466.27] paid out of the said savings account and charged against the savings account of Martha Tribulas were improperly paid out, improperly charged against the savings account of said Martha Tribulas and that the money so withdrawn was not paid to Martha Tribulas or to anyone authorized to act for her or in her behalf." In the affidavit of defense it was averred that plaintiff withdrew, on dates and in amounts specified, $11,966.27; that she knew her account had been closed; defendant denied that the orders or checks alleged to have been executed by the plaintiff were "improper, unauthorized and forgeries" as alleged by her. The affidavit also set forth that the amounts charged against the account had been properly paid and "that after the plaintiff withdrew the balance in her account

on June 24th, 1931, she made no demand upon defendant for the payment of any sum or sums prior to the institution of this suit upon the 16th day of April, 1936. Defendant avers that at all times prior to June 24th, 1931, the plaintiff knew the withdrawals made in said account and on June 24th, 1931, accepted the sum of $466.27 as payment in full of the balance in said account."

There was a verdict for the plaintiff for the full amount with interest. Defendant then made three motions, 1, asking leave to amend its affidavit of defense by setting up the statute of limitations; 2, a motion for a new trial, and, 3, a motion for judgment n. o. v. The learned court below granted the last motion and said that "in view of this ruling it is unnecessary to consider the motions for new trial and for leave to file an amended affidavit of defense." These motions were accordingly overruled, pro forma, we assume.

Plaintiff's husband, Baltram Tribulas, was engaged in the real estate business, owned a hotel in Atlantic City, and had an active account with the defendant bank, at times with a credit of as much as $30,000. There was evidence to indicate that plaintiff was also interested in his real estate business. She ran a hotel in Atlantic City for three summers; her husband testified that he was also interested in that business with her. On September 3, 1918, he accompanied her to the defendant bank where she opened an account, called in the evidence a savings fund account. She could neither read nor write English.[1] The signature card has stamped on it the word "Special" which, the evidence shows, was the way in which savings fund accounts were distinguished by the bank from general accounts. The face of the signature card is as follows:

---

[1] She testified: "Q. Did you sign your name? A. I put a cross mark. You see, my signature is not very good, like Chinese writing, he told me to put the cross mark and I put the cross mark."

AUTHORIZED SIGNATURES OF

9/3 19 18

SPECIAL
4894 her

(SIGN HERE) Martha X Tribulas

mark
Baltram Tribulas

Witness

CONTINENTAL-EQUITABLE TITLE AND
TRUST COMPANY

Tribulas Martha

On the reverse side of the card appears the following in ink:

Age 32 yrs
Born Russania State Russia
Mother living father dead 4 sisters in
 America
 1 brother in Russia
ADDRESS

Children 2 girls 1 boy
(1 adopted)

BUSINESS

INTRODUCED BY Baltram Tribulas

Beside the word "ADDRESS" were written with ink the words "3500 Wharton St." afterward changed in pencil to another address.

A passbook was given to her at the head of which was the following:

CONTINENTAL-EQUITABLE TITLE & TRUST CO.
DR. In account with Martha Tribulas CR.

Ten Days Notice Required.

On the inside cover of the front of the book were printed instructions, none of which has any immediate relation to the questions involved, probably because the same form of passbook was used for savings accounts as was used for commercial accounts, apparently the only difference being that the words "Special" and "Ten Days Notice Required" were stamped on them.

When the account was opened, the Act of June 12, 1907, P. L. 525, 7 PS section 324, was in force, providing in section 1 that such bank "shall furnish each depositor or investor with a receipt in full, by pass-book or otherwise, for all moneys received, whether as deposits, dues, or on account of installments for any trust or investment whatever, which, until refunded, shall constitute a liability upon the part of the corporation, and shall be kept in proper form on books prepared for the purpose."

The pass book was put in evidence by the plaintiff and shows that it was balanced for the first time on February 15, 1922; on that date the bank had charged itself with the amounts deposited as they were entered at the time of deposit, together with five items of interest payable to the depositor, making a total of $19,-203.67. The bank claimed credit on the other side of the account for depositor's withdrawals by checks in the sum of $17,698.64, leaving the bank indebted in the sum of $1,505.03, which was carried forward as a new balance.

The book was balanced again May 28, 1923, when the plaintiff's balance was $637.22, credit having been taken for a withdrawal by her of $1,000; it was balanced a third time, January 7, 1924, when plaintiff's balance was

$146.50, credit having been taken for the withdrawal of $500 by her check dated June 27, 1923.

Thereafter credits appear by a deposit of $1,220 on February 21, 1926, and by entries of interest for each year until August 25, 1930. Then the balance carried forward in plaintiff's favor as of December 30, 1930, was $452.68. The only withdrawal during that period was the sum of $1,000, May 17, 1927. This withdrawal will be referred to later as the Fitzpatrick check. On June 24, 1931, the account was closed by the plaintiff's receipt of $466.27, which, we assume, is the balance of $452.68 appearing on December 30, 1930, with interest to the date of closing the account. There was evidence that savings accounts received higher rate of interest than checking accounts. A witness for defendant testified that "withdrawal had to be made at the office. We had our own special checks that were only good within the office. They were a yellow check marked 'Special' on the end. By the Court: Q. What do you mean that withdrawals must be made in the office? A. I mean that we would not permit negotiable checks to be issued against savings accounts. Q. You mean you could not put a check in through another bank? A. That is right. Q. How about the passbook? A. The passbook had to be there with the withdrawal. By Mr. Ewing: Q. I imagine sometimes the bank waived the ten days' notice for convenience sake if it was necessary? A. Sometimes, if it was necessary and if the depositor was well-known and had a good account. Q. What significance do the notations have on the last page of this book? (Indicating exhibit 'P1.') A. Those were notices of withdrawals. Q. Were notices of withdrawals given to cover withdrawals in this account? A. That is true. Q. And they were noted in the back of the book? A. That is right."[2]

---

[2] There is evidence to show that in two instances notice was waived by the bank.

The contract between the bank and the plaintiff cannot be found from the passbook and the signature card alone, because, as has been seen, part of it is in parol, so that if any term of the contract depending upon oral evidence became important it would be necessary to have the jury pass on the oral evidence. The defendant of course concedes that by accepting the deposit it became plaintiff's debtor; it is also agreed that plaintiff had the right to withdraw the deposit or any part of it after ten days' notice; as it was a "Special" account, she would be required to use a check marked "Special."

We come then to the accounts as they appear in the documentary evidence. The account, balanced February 15, 1922, showed that, against interest allowed and deposits to her credit amounting to $19,203.67, the bank had charged withdrawals of $17,698.64, leaving a balance of $1,505.03 carried over as the debt remaining due to her. Now, it is not without interest to note that out of the total of $17,698.64 withdrawals charged against her, she makes no question of $8,698.64; that total is charged as having been paid to her in 1919 and in 1920; she concedes having received that. Her contention is that the remaining $9,000 then charged against her was paid without her authority and is part of the sum in suit. That $9,000 was represented by two checks on the form specified for such accounts, one in the sum of $5,000 dated June 2, 1921, drawn to the order of her husband and indorsed by him, and the other, in the sum of $4,000, dated February 14, 1922, to her own order with her name written on the back of it alongside her mark and followed by the signature of Baltram Tribulas as witness. On cross-examination she was shown the $5,000 check and said: "That is Mr. Tribulas' signature"; but she said, "I never put that cross.mark. He never told me nothing about that money, that he is going to take it, he gypped me, you know." Her testimony with regard to the other three "Special" checks

referred to above as charged against her account, was substantially to the same effect.

It has been held in this state that after a passbook has been settled with entries of deposits and credits and delivered to the depositor, he is bound personally or by authorized agent, with due diligence, to examine the account and without unreasonable delay to advise the bank of any error in it. If he fails to do that, the balance passbook becomes an account stated. An account stated is subject to impeachment if challenged seasonably; a depositor may wait too long. In *Greenhalgh Co. v. F. Nat. Bank,* 226 Pa. 184, 188, 75 A. 260, we said: "A balance struck in a pass book is in effect an account stated between a bank and its depositor, which it is true may be impeached for fraud or error, but unless so impeached the bank is estopped from denying its liability as shown by the account so stated by it. This doctrine is of universal application. Whether a bank is or is not estopped from denying its liability for a balance stated by reason of fraud or error depends upon the facts, which are for the jury. In such a case the burden is on the bank attempting to evade responsibility, because the presumption is that the balance stated by its own officers is correct and truly represents the account between the parties." In *United Security, etc., Co. v. Bank,* 185 Pa. 586, 601, 40 A. 97, it was said: "A bank book settled, balance struck and checks returned to the depositor, will of course become an account stated if not promptly examined and errors of amount pointed out for correction, but the depositor is under no obligation to follow up and ascertain the genuineness of the indorsements that carry the title after the check has left his hands: *Leather Manufacturer's Bank v. Morgan,* 117 U. S. 96; *Welsh v. German Am. Bank,* 73 N. Y. 424." See also, *Thompson v. Republic Trust Co.,* 84 Pa. Superior Ct. 183, 189; *Myers v. Bank,* 193 Pa. 1, 12, 44 A. 280; *McNeely v. Bank,* 221 Pa. 588, 70 A. 891; *F. & M. Bank v. Bank,* 165 Pa. 500, 504, 30 A. 1008; *Iron City Bank v. Bank,* 159 Pa. 46, 28 A. 195; *Marks v.*

*Anchor Savings Bank,* 252 Pa. 304, 307 et seq., 97 A. 399; *Sergeant's Exrs. v. Ewing,* 30 Pa. 75, 83.

When this suit was begun, the first account stated had gone unchallenged for more than 14 years, the second for almost 13 years and the third for more than 12 years. We need not, for the purposes of this case, speculate on what would be a reasonable time for the challenge of such accounts stated; as the period of limitations fixed by statute is only six years, the jury should have been instructed that on the admitted facts plaintiff by her silence during the periods specified had estopped herself from recovering for any items charged to her account prior to the last balancing of the book January, 1924: see *Morgan v. Lehigh Valley Coal Co.,* 215 Pa. 443, 447, 64 A. 633. In *Penn Bank's Estate, Walters's Appeal,* 152 Pa. 65, 25 A. 310, the court said: "The bank stated his account and delivered it to him. For more than six years he has acquiesced in its correctness. His right of action, assuming that he had one in May, 1884, is now lost by the lapse of time, and the auditor and the court below were right in denying his right to participate in the fund." This conclusion is not affected by plaintiff's inability to read or write; she had ample opportunity to obtain advice of the effect of the balancing of her passbook from time to time. Compare *Greenfield's Estate,* 14 Pa. 489, 496; *Bulakowski v. Phila. Sav. Fund Soc.,* 270 Pa. 538, 113 A. 553. Nor is it material that, according to her testimony, during part of the time between 1924 and 1931, her husband had the book; he denied that he had it. The book was hers, given to her in compliance with a statute requiring it; if she was deprived of it by her husband or in any other circumstances, she should have advised the bank. The fact is not disputed that she had the book when the balances were struck; she had it February 21, 1926,[3] when she

---

[3] This date is conclusively settled by the bank's ledger card; we think counsel for appellant was mistaken at the argument in asking us to correct the year, as he had printed it, from 1926 to 1921.

made the deposit of $1,220. She produced it in 1931 when she withdrew the last balance and closed the account.

If no transactions subsequent to the third balancing of the book were involved, we should be able to end this litigation now by affirming the judgment on the ground of plaintiff's estoppel. But there remains for consideration the check of May 17, 1927, for $1,000 referred to above as the Fitzpatrick check. This withdrawal appeared charged against her account as of May 17, 1927, when the account was closed in June, 1931. She testified that she did not receive the money and that she did not make her mark to the check. It is an order prepared on one of defendant's "Special" forms to "transfer to Baltram Tribulas $1,000." It bears the name of Martha Tribulas and a mark; alongside the mark is written "Witness J. Fitzpatrick, Assistant Treasurer" in his writing. On the back of it appears "Credit account of Baltram Tribulas," together with the name Martha Tribulas with her mark also witnessed by the assistant treasurer. Mr. Fitzpatrick died before the trial, so that the parties do not have his testimony describing the transaction. Baltram Tribulas testified on behalf of the defendant. He was shown the check and testified that there was "No signature on this check of mine." We understand him to mean that though his name appears on the check twice, he did not write either. "Q. Was that $1,000 transferred to your account? A. I cannot remember. Maybe yes. Maybe she came in herself, because she used to work with me. She made deposits and made deposit cards maybe, but not my signature on this one, and I cannot tell. Q. You know nothing about it, you can give us no information as to the occasion? You don't even know whether you were present at the bank when there was a transfer of $1,000 from her account to your account? A. I cannot remember that long. Maybe I was. I just got to look at my check. The same day a check was deposited she put on my book. I could

prove it, but never was such times until 1933. She used to work with me together. Q. The trouble between you and your wife existed for a considerable length of time prior to 1931, didn't it? A. Until 1933 we started— 1932 she started to look for trouble all the time. Q. Just answer the question. In 1933 the divorce was started— is that correct? A. She left."

Plaintiff testified that when she drew the balance of $466.27, on June 24, 1931, and surrendered the passbook, her husband was not present. She states that when she was told by the bank that her balance was $466.27 she protested; "I was crying and fighting and everything, and he told me to get out, that is all." This check for $466.27 is in evidence and shows that her mark was witnessed by Baltram Tribulas her husband; this appears both on the front of the check and on the back where her name also appears with a mark. He testified that he was present with her in the bank when she received the money and that he witnessed her mark. In appellant's brief it is stated that "The Plaintiff herself made all of the deposits in her account. In addition the evidence shows that plaintiff was frequently a visitor in the bank on behalf of her husband who was also a depositor. The evidence on behalf of Defendant was that plaintiff was well known to the employees of the bank."

Notwithstanding that the bank has been out of business for some years and that it may be difficult to find the persons who were employed by it at the time, and that Mr. Fitzpatrick's death deprived the parties of his evidence, the positive testimony[4] of the plaintiff, as it

[4] "Q. I show you a check dated May 17, 1927, to the order of Baltram Tribulas, for $1,000, and ask you if you made your mark on that check? A. No, sir, I never make it. I never saw those checks. Q. Now, Mrs. Tribulas, you will notice that check is not witnessed by your husband. A. I don't know who it is, the witness, I know it is not me. I never saw those checks. I saw the last one—Q. Just a minute—this check is witnessed by a man named

now appears in the record, that she did not receive the $1,000 represented by the Fitzpatrick check makes an issue of payment as to that item to be determined by the jury. The burden of showing due care is on the defendant: *Bulakowski v. Phila. Sav. Fund Soc.,* 270 Pa. 538, 113 A. 553. We must therefore reverse the judgment. We also think that leave to amend the affidavit of defense in accord with defendant's motion should be granted.

Judgment reversed and a new trial awarded.

DISSENTING OPINION BY MR. JUSTICE MAXEY:

I agree that a new trial should be granted in this case but in that trial plaintiff's right of recovery should not be limited by binding instructions to the item of $1,000 on the check for which W. J. Fitzpatrick's name appears as a witness. Whether or not plaintiff is entitled to recover all the sums which she declares were paid out on forged endorsements is entirely a question of fact and is therefore for the jury.

The majority opinion says: "When this suit was begun, the first account stated had gone unchallenged for more than 14 years, the second for almost 13 years and the third for more than 12 years. We need not, for the purposes of this case, speculate on what would be a reasonable time for the challenge of such accounts stated; as the period of limitations fixed by statute is only six years, the jury should have been instructed that on the admitted facts plaintiff by her silence during the periods specified had estopped herself from recovering for any items charged to her account prior to the last balancing of the book January, 1924: see *Morgan v. Lehigh Valley Coal Co.,* 215 Pa. 443, 447, 64 A. 633."

---

Fitzpatrick, who was Assistant Treasurer of the bank? A. I don't know. I don't know that Patrick. Q. Didn't you make your mark at the bank in the presence of Mr. Fitzpatrick? A. No, sir, I can swear to God. He may bring the woman with him, somebody else. I never saw the check."

I found nothing in this entire record which would warrant the holding that there was any "account stated" between this depositor and the bank. An "account stated" is "an agreed balance of accounts. An account which has been examined and accepted by the parties: 2 Atk. 251," Bouvier's Law Dictionary. There is nothing in this case showing that there ever was an "account stated" between the parties. No "account stated" was mentioned in the pleadings; no "account stated" was mentioned by Judge LAMBERTON in his charge to the jury; and no "account stated" was referred to by Judge ALESSANDRONI in his opinion supporting the entry of judgment for defendant n. o. v. I will go further and state that if the issue in this case had been the existence of an "account stated," *which decidedly it was not,* that issue, if prima facie supported by proof, *would have had to go to the jury.* Furthermore, if an account stated had been properly raised by the pleadings, the bank would have failed on this record to make out a prima facie case showing an "account stated." What an "account stated" as between a bank and its depositor is, has been frequently clearly defined by this court and the Superior Court of this State. In *Thompson v. Republic Trust Co.,* 84 Pa. Superior Ct. 183, 189, that court said: "A bank book settled, balance struck and *checks returned to the depositor,* will become an account stated if not promptly examined and errors of amount pointed out for correction: *United Security Life Ins. & Trust Co. of Pennsylvania v. Central National Bank of Philadelphia,* 185 Pa. 586, 601 [40 A. 97]. This is in harmony with the rule as declared in 3 R. C. L. section 161, p. 532, as follows: 'It may be stated generally that the entry of the debits and credits in a depositor's passbook by a banking institution striking a balance and then delivering the book to the depositor *with his cancelled checks,* constitutes a rendition of account so that the retention of the book so balanced by the customer for an unreason-

able time without objection to the account as rendered will constitute an account stated.' " [Italics supplied.]

It will be observed that it is an essential of an account stated between a bank and its depositor that the checks shall be returned to the depositor. There is no evidence in this record that any checks were returned to the depositor. Every check put in evidence in this case was put in *by the bank*. Every check is marked as a *defendant's* exhibit. The first reference to a disputed check is on page 22a of the record where the bank's attorney in cross-examining Mrs. Tribulas, said: "I show you a check dated February 14, 1922, for $4,000. This check was drawn to the order of Martha Tribulas." Her reply was: "I never marked it. I don't know nothing about it." She was then asked: "And it has your name on the back. Did you make the cross-mark on the back?" She replied: "No, I can swear to God I never made those marks, I can drop dead on the floor. I never saw it." As to the other checks, she testified: "I never saw those checks."

The majority opinion contains the following statement: "It has been held in this state that after a passbook has been settled with entries of deposits and credits and delivered to the depositor, he is bound personally or by authorized agent, with due diligence, to examine the account and without unreasonable delay to advise the bank of any error in it. If he fails to do that, the balanced passbook becomes an account stated." This record is barren of any evidence that the depositor's passbook *was delivered to her,* after entries of deposits and credits or at any other time. Besides, the *return of the cancelled checks* to the depositor is an *indispensable element* in the account stated, and this was not done here. Mrs. Tribulas denied that she had the book in her possession from the time she opened the account until she drew out the balance in 1931. "He had it in the safe," she said. The *passbook* shows February 21, *1921,* was the date of the last deposit: $1,220. The bank says this

was an error, that the ledger sheet shows February 21, 1926, was the date of the last deposit. This discrepancy emphasizes the fact that this was preëminently a case for the jury. Whether she made the deposits personally or sent her then friendly husband with them, nowhere appears.

The balancing may have been done on the bank ledger sheets from time to time after the large withdrawals on the questioned checks, for the purpose of computing interest on the balances; what appears in the bank book by way of balancing may have been copied in there long afterwards. A former clerk of the defendant bank testified that the entries on the ledger sheet were made at the time the various transactions in the account took place, *but no one testified that the entries in the pass-book were contemporaneously made.* It is not unusual for entries in a passbook to be made after the fact, as ofttimes a bank depositor does not take his book to the bank with him even when he is making a deposit. This same witness (Cassidy) testified that he had no knowledge as to the withdrawals in this account (except the last one, the closing check, which is not in controversy) other than the information he had gotten "from the records of the bank."

Even if an "account stated" between these parties had been pleaded and proved (and this, I repeat, was *not* done), the effect would be a question *for the jury* under proper instructions, but it is *not* a matter of *binding* instructions. In *F. & M. Bank, to use, v. Bank,* 165 Pa. 500, 505, 30 A. 1008, this court said: "The defendant was entitled to go to the jury on the question of the authority of the assistant cashier and the subsequent ratification of his acts, and *of the binding effect of a settlement made and acquiesced in for a length of time,*" (italics supplied). In *Thompson v. Republic Trust Co.,* supra, 84 Pa. Superior Ct. 183, 190, that court reaffirmed the principle of "the right of a defendant to go to the jury upon the question of the effect of a settlement made

and acquiesced in for a long period of time." If a defendant has the right, it follows that a plaintiff has the same right.

In *Dana v. National Bank of the Republic,* 132 Mass. 156, the Supreme Judicial Court of that state held that in an action by a depositor against a bank to recover the amount of a check (alleged to have been fraudulently altered), the defendant was not entitled to a ruling, *as a matter of law,* that if the plaintiff did not, after a reasonable opportunity to examine the checks returned, object to the payment of the check in question, he would be presumed to have ratified it; but that the question of ratification was for the jury.

In *Shipman v. Bank of State,* 126 N. Y. 318, 27 N. E. 371, it was held that an account stated can always be opened upon proof of mistake or fraud. In *Los Angeles Inv. Co. v. Home Sav. Bank,* 180 Cal. 601, 182 P. 293, it was held that though there was an account stated between a bank and its depositor by the rendition of semi-monthly statements, such account stated could be opened by the depositor for fraud or mistake, as mistake by the depositor in drawing checks on the requisition of the manager of its insurance department to fictitious payees whose indorsements were forged by the manager and the checks cashed with the bank. In *Rettig v. Southern Illinois Nat. Bank,* 147 Ill. App. 193, it was held that the failure of a depositor to examine his passbook within a reasonable time does not conclusively estop him from showing the incorrectness of the balance. In *Re Ruskay* (C. C. A.), 5 F. (2d), 143, 147, it is stated: "Mistakes in bank accounts are not uncommon. They preclude no one from ascertaining the truth and claiming its benefit." In *Mechanics Bank of the City and County of Philadelphia v. Earp,* 4 Rawle 384, it was held that the settlements of the depositor's bank book did not alter the rights of either party.

In *Leather Mfgrs. Bk. v. Morgan,* 117 U. S. 96, in which the action was between a bank and a depositor,

and the trial court gave binding instructions to the jury, the Supreme Court of the United States reversed the trial court and held that the question whether the depositor exercised in regard to such examination ( i. e., of his passbook and cancelled checks) the degree of care required of him in the circumstances disclosed by the evidence, including the relations of the parties and the established usages of business, and the question whether the endorsement of a particular check was, under the evidence, an endorsement in blank or one for deposit to the credit of the depositor, were for the jury, under proper instructions as to the law.

In the case appearing at the end of the above quoted excerpt from the majority opinion, that is, the *Lehigh Valley Coal Company Case,* the facts were found by a referee and in that case this court said: "As to whether the monthly statements were accounts stated, and therefore within the statute of limitations from the date when rendered, must be determined by the facts in this case." It follows that if that case had been tried by a jury, the question whether or not the monthly statements were accounts stated, would have been a jury question, as it depended on the facts.

In *Frankini v. Bank of America Nat. Trust & Savings Assn.* (Cal.), 55 Pac. (2d) 232, it was held that whether depositor suing bank for amount paid by bank in cashing forged checks from depositor's account was contributorily negligent merely because he left blank checks, green ink, and protectograph on desk in private office in his home, or whether he exercised due care in promptly examining his passbook, paid checks, or statement of account, or whether he notified bank of error within agreed ten days after expiration of time covered by statement, were all questions for the jury. In *Fletcher American Nat. Bank v. Crescent Paper Co.* (Ind.), 139 N. E. 664, it was held that in an action to recover money paid on paper forged by employee, it was a question for the jury to determine whether due diligence was used in examin-

ing returned checks and accounts. The same ruling in a similar state of facts was made in *Deer Island Fish & Oyster Co. v. First Nat. Bank* (Miss.), 146 So. 116. In *McCornack v. Central State Bank* (Iowa), 211 N. W. 542, it was held that whether depositor was negligent to bank's prejudice in not sooner discovering fraud of forger procuring from him checks payable to fictitious person, was a question for the jury. In *Ponsell v. Citizens' & Southern Bank* (Ga. App.), 133 S. E. 351, it was held that whether facts pleaded and proved in exculpation of failure to notify bank that checks paid on plaintiff's account were forgeries were such as to excuse depositor, was a question for the jury.

The pleadings in this case were "clear cut" and were set forth by the trial judge, who, as we have already noted, did not say anything about an "account stated," for the pleadings did not. Plaintiff in her statement pleaded the deposits amounting to $12,000, her demand for the same and averred that "all moneys paid out of the said savings account (except $466.27) were improperly paid out, improperly charged against the savings account of said Martha Tribulas and that the money so withdrawn was not paid to Martha Tribulas or to anyone authorized to act for her or in her behalf." Defendant averred that "the sums in said savings account were withdrawn by plaintiff upon her checks, withdrawal slips or notices properly executed by the plaintiff and duly witnessed in accordance with the instructions of plaintiff on file with defendant." Defendant also averred that plaintiff "knew the withdrawals made in said account" (which, of course, she did if the withdrawals had been made upon her checks properly executed). Defendant also averred that on June 24, 1931, plaintiff "accepted the sum of $466.27 as payment in full of the balance in said account." Nowhere in the pleadings is any mention made of an account stated.

It is fundamental, of course, that "if plaintiff's action is based on an account stated, it must be pleaded": 1

C. J., Secundum, p. 742, sec. 63. It follows that if the defense to an action for debt is an "account stated," it must be pleaded. "Every pleading shall contain and contain only, a statement in a concise and summary form of the material facts on which the party pleading relies for his claim, or defense, as the case may be, but not . . . inferences or conclusions of law": Section 5 of the Practice Act of 1915, P. L. 483.

The entry of judgment for defendant n. o. v. in this case was due to a misconception of where the burden of proof lay. This action was nothing more than a simple action of assumpsit by a creditor against a debtor. The fact that the debtor was a *bank* did not change the legal aspects of the action. That the relation between a bank and its depositors is that of debtor and creditor is "firmly settled": *Gartner v. Cassatt et al.,* 313 Pa. 491, 169 A. 889. "The right of a depositor is a mere chose in action": Zollmann on Banks & Banking, Vol. 5, p. 144, sec. 3153. See also *N. Y. County Nat. Bk. v. Massey,* 192 U. S. 138.

The court below fell into error in placing the burden of proof, by not distinguishing this case from *Bulakowski v. Philadelphia Saving Fund Society,* 270 Pa. 538, 113 A. 553. In that case there was a rule printed in the depositor's passbook, reading as follows: " 'If any person shall present a deposit book at the office of the society pretending to be the depositor named therein, and shall thereby obtain the amount deposited, or any part thereof, and the actual depositor shall not have given previous notice at the office of the loss or theft of the book, the society will not be responsible for the wrongful payment, nor be liable to make good the same; provided that it has been entered in the book when made.' " In the *Bulakowski Case* the payment was made to a person who presented a passbook to the bank, and before the depositor had notified the bank of the book's loss. It further appeared that the person who presented the book correctly answered the questions suggested by the

identifying data on the signature card. It was held that "this evidence would relieve defendant from liability, and entitle it to binding direction unless plaintiff proved it [i. e., the bank] had not used due care in identifying the person presenting the book and receiving the money." This court there held that under such circumstances the burden was upon the plaintiff to establish negligence and that it had failed to do so.

The *Bulakowski Case* is utterly inapposite here because *here the passbook contained no such or similar rule.* Mrs. Tribulas did not by accepting the passbook authorize the bank to pay moneys out of her account to any person presenting it. There are many "passbook cases" but this is not one of them. In the instant case, J. B. Cassidy, who identified himself as having been "with the Continental Equitable Title and Trust Company from about 1918 until 1932" testified that "everyone [of the 7,000 depositors] was given a book similar to this [referring to plaintiff's passbook]" and "without any notice of savings fund rules and regulations" *such as "these books usually do"* (italics supplied).

This *not* being a typical "passbook case," the question comes down to this: Plaintiff's deposits with the bank having been proved and the plaintiff having denied that she had received a return of these deposits, *on which party lies the burden of proof?* All the authoritative cases hold that in such a case the burden lay on the defendant exactly as in any other case where a creditor sues a debtor and the debt is proved and payment is pleaded.

The Court of Appeals of New York clearly stated the correct rule in cases of this character in its opinion in *Noah v. Bowery Sav. Bank,* 225 N. Y. 284, 122 N. E. 235, where it adjudged the lower court to be in error in charging the jury that a depositor has the burden of proof. That court said: "The action was for money which the defendant owed to the plaintiff. The debt was admitted. The defense was payment to a third

party under such circumstances of care and diligence as to relieve the bank from liability. The burden, therefore, was upon the bank to prove this defense, and that it exercised due care and diligence in making payment. . . . Payment in a case like this is an affirmative defense to be proved by the party alleging it." In *Leff v. Security Bank of New York,* 93 Misc. Rep. 139, 157 N. Y. S. 92, the Appellate Term of the Supreme Court held: ". . . The burden of establishing the defense of payment authorized by the depositor is upon the bank, as well as the burden of establishing the defense of estoppel by reason of the alleged contributing negligence of the depositor by which the bank has been misled. The only burden resting upon the plaintiff is proof of the deposit and of the balance remaining due after deducting payments admittedly authorized by plaintiff."

The court below in entering judgment for the defendant n. o. v. quoted the following from the opinion of this court in the *Bulakowski Case,* supra: "The depositor has the burden of proving negligence on the part of the bank *(Israel v. Bowery Savings Bank,* 9 Daly, N. Y. 507), and here the burden of proof rested on plaintiff to prove the bank had not exercised the care necessary under the circumstances." The *Bowery Savings Bank Case* referred to was a case tried in the Court of Common Pleas of New York City in 1882. The report shows that among the rules and regulations printed in the bank book was that "no person shall have the right to demand any part of his principal or interest without producing the original book. All payments made to persons producing the deposit book shall be deemed good and valid payments to depositors respectively." That court held: "The rules printed in the book are, when properly made known to the depositor, a part of the contract between him and the institution." In the instant case there were (as already noted) no rules in the passbook or elsewhere, assented to by the depositor and af-

fecting the latter's rights to put the bank to the proof of payment.

The rule stated by the New York Court of Appeals (above quoted) is apparently the rule in practically all other jurisdictions. See *Fourth & Central Trust Co. v. Rowe* (1930), 122 Ohio State 1, 170 N. E. 439; *Harmon v. Old Detroit Nat. Bk.*, 153 Mich. 73, 116 N. W. 617; *Zuplkoff v. Charleston Nat. Bank* (W. Va.), 88 S. E. 116; and *Yarborough v. Banking, Loan & Trust Co.*, 142 N. C. 377, 55 S. E. 296.

In *Barmby v. Merrimack Co-op. Bank*, 285 Mass. 27, 188 N. E. 378, the Supreme Judicial Court of Massachusetts held: "It is well settled that a bank on which a check is drawn must ascertain at its peril the identity of the signature of its depositors and that payment of a forged check cannot be charged against a depositor if he is free from any negligence which contributed to the fraud practiced upon the bank."

In *Berndt v. Hoboken Bank for Savings in City of Hoboken*, 103 N. J. L. 478, 135 A. 818, the Court of Errors and Appeals of New Jersey held: "The plaintiff had denied that the $900 in dispute had ever been received by her or paid out on her order, or by any one who had power or authority to withdraw it, and denied also that the signature on the receipt in dispute was her signature. The burden of proof, under the circumstances in this case, was on the bank to exonerate itself from want of due care if it failed to turn over to the depositor the moneys to which such depositor would ordinarily be entitled. It is a well-settled principle of law that payment in a case under like circumstances is an affirmative defense."

In *Patterson v. Marine Nat. Bk.*, 130 Pa. 419, 18 A. 632, it was held that where money is deposited in a bank by plaintiff as "agent" and there is nothing on the face of the deposit to show for whom he is agent, and the bank refused to pay plaintiff's checks, and pays the money over to a third party, it does so at its peril; and

in a suit by the plaintiff the burden of proof is on the bank to show that the money did not belong to plaintiff, but did belong to the party to whom it paid it. For another example of the burden of proof resting on the bank, see *Arnold et al. v. The Macungie Savings Bank,* 71 Pa. 287.

Zollmann on Banks and Banking lays down these principles, Vol. 2, page 367, section 1231: "A savings bank which does not exercise reasonable care and diligence in paying a deposit to an impostor is liable to the depositor for the consequences of its mistake. [Citing *Wegner v. Second Ward Sav. Bank,* 44 N. W. 1096, 76 Wis. 242, 249.] Payment of the deposit is an affirmative defense as to which the bank has the burden of proof. . . ." Vol. 5, page 285, section 3295: "While ordinary care does not require a bank which accepts a deposit from an illiterate customer to close all avenues of fraud, the care which it owes to such a depositor certainly is not any less than that which it owes to a depositor who can read and write and thus is better able to protect himself. The bank therefore, while it is protected where it pays out such an account to a forger with due care, has the burden of justifying its payment. . . . Extra precautions should be taken as to depositors who sign by mark. [Citing *Wronski v. Frankford Trust Co.,* 84 Pa. Superior Ct. 511, where the question of the bank's care was submitted to the jury.] . . . The name, however, is only one means of determining ownership. A custom to require such a customer to answer test questions which are entered on the signature card is certainly a reasonable one. . . . It will be also very advantageous for the bank to enter some information of the depositor's physical appearance on the signature card. It might be added that in these modern days the bank might well require an illiterate depositor for his own protection to leave his fingerprint for identification."

The cases cited in the majority opinion do not warrant its decision. One of these cases is *Greenhalgh Co.*

*v. Farmers Nat. Bk.,* 226 Pa. 184, 75 A. 260. In that case this court distinctly said: "Whether a bank is or is not estopped from denying its liability for a balance stated by reason of fraud or error depends upon the facts, which are for the jury." Another case cited by the majority opinion is *United Security Co. v. Bank,* 185 Pa. 586, 601, 40 A. 97. The decision in that case made "checks returned to the depositor" an essential part of an "account stated." As we have already pointed out, there is no proof here that the checks were returned to the depositor. The proof is the other way, as it was the defendant bank which produced the checks at the trial. In the case of *Thompson v. Republic Trust Co.,* 84 Pa. Superior Ct. 183, and *Leather Mfgrs. Bank v. Morgan,* 117 U. S. 96, cited in the majority opinion, it was held, as we have heretofore pointed out, that the question raised was *for the jury. Sergeant's Exrs. v. Ewing,* 30 Pa. 75, cited in the majority opinion, holds only (quoting from syllabus) that "an account rendered to a party indebted, by his creditor, and not objected to in a reasonable time, is *prima facie* evidence against the party to whom rendered." In *Penn Bank's Estate, Walter's Appeal,* 152 Pa. 65, 25 A. 310, cited in the majority opinion, an *auditor* found that it was not clear as a matter of fact that there had been any mistake in the account rendered the depositor by the bank. This court held that this finding by the auditor "unless shown to be plain error must be regarded as conclusive." Findings of fact by an auditor have, of course, the same legal effect as findings of fact by a *jury.*

This case was preëminently a case for a jury. The deposits were admitted, and the depositor claimed that the withdrawals were made on forged crosses (Xs). The bank pleaded that the checks had been "properly executed by the plaintiff" or, in other words, that the crosses had been made by her. This was as definite an issue of fact as it would have been had she been able to write her name and had claimed that her signature had

been forged. The possession of the passbook had nothing to do with the withdrawals, as no rule of the bank required the production of the book when withdrawals were made. She claimed that her husband had locked the passbook in his safe since 1924. Whether or not she had the passbook in her possession when the withdrawals were made is wholly immaterial. If the bank paid out her money on a forged cross (X) as her "signature," it is liable. Cassidy, the former bank clerk, was asked if he had "any knowledge as to the withdrawals in this account, other than the information which you have gotten from the records of the bank" and he replied: "That is all, except the last one." As to the last one he said that he "made that closing check to close the account." He testified to her making her mark on that undisputed closing check. No one except Mrs. Tribulas' husband testified to her making her mark on the other checks and he is not only a hostile witness, he and his wife being estranged, but he is an interested witness, for it is undisputed that the proceeds of every disputed and allegedly forged check *were paid into his account in the same bank.* J. J. O'Donnell, who had been paying teller in the defendant bank at the time of the transactions in question, testified that "there was no actual cash paid on these [disputed] checks. They were issued at the savings fund window and immediately deposited with the receiving teller." All the checks put in evidence by defendant bank, show that the husband, Baltram Tribulas, had the proceeds of the checks credited to his account. All this tends to confirm Mrs. Tribulas' view of this case, to wit, that her husband forged her cross on the checks and appropriated the proceeds.

That this woman would make deposits from time to time before and during 1921 of sums ranging from $300 to $2,952.50 and that the withdrawals made after 1920 were of large sums of, respectively, $5,000, $1,000, $4,000, $500 and $1,000 and all for the benefit of Baltram Tribulas who claims to have witnessed his wife's

"mark," lends support to this woman's claim that her husband "gypped" her and that the carelessness of the bank officials and clerks made it easy for him to do so. The passbook shows that the date of the last deposit was February 21, 1921, in the amount of $1,220; the ledger sheet of the bank shows that the last deposit of $1,220 was made on February 21, 1926. This shows a discrepancy between the bank's ledger sheet and the entries made in plaintiff's passbook, and indicates that there was at least some carelessness on the part of the bank.

I cannot agree with counsel for the bank that "the facts in the case at bar show that the plaintiff instructed the bank to pay money out of her account on orders bearing a cross mark witnessed by her husband. . . ." To uphold the position advanced by counsel we would have to read into the "signature card" something which neither the parties themselves nor the law put into it. The bank did not in practice so construe the "signature card," for on May 17, 1927, it paid out one thousand dollars on an order purporting to bear Mrs. Tribulas' "mark" (X) and witnessed *not by her husband* but by "W. J. Fitzpatrick, Asst. Treasurer." The bank cannot now by its counsel convincingly plead for a judicial construction of the "signature card" which would logically force the conclusion that the bank in at least one instance breached its contract with the depositor and, according to her testimony, caused her a loss of one thousand dollars.

Appellee also says: "It is inconceivable what other precautions could have been taken by the bank. Most certainly the bank established that every reasonable precaution was taken. The burden was then on the plaintiff to prove negligence on the part of the bank. This she failed to do and consequently the court below properly entered judgment n. o. v.: *Bulakowski v. Phila. Saving Fund Society,* 270 Pa. 538 [113 A. 553], (1921)."

It is obvious that the bank could have taken many other precautions to protect both itself and its deposi-

tor. It could have provided in the passbook (as apparently it *has since 1928)* that it should be presented when withdrawals were to be made and that such presentation, unless the bank had been given timely notice of its loss or theft, should be prima facie proof that the order for withdrawal was authoritative. It could have tested the withdrawer's identity by asking questions based on data available on the "signature card." There is no evidence that the bank did this. It could have taken many other customary precautions against the possibility of being imposed on. The bank did not call any witness who remembered plaintiff being present when these withdrawals were made. The bank's inability to do this is understandable but it is not so easy to understand why the bank did not require some of its numerous officers or clerks who, it is testified, "well knew" this illiterate depositor, to make a notation in the bank's records that she was identified and by whom, when the withdrawals were made. With such a record to "refresh recollection," convincing proof of the making of payments on plaintiff's order could have been offered, if such *was the fact.*

The majority opinion quotes Cassidy, the former bank clerk, as follows: "The passbook had to be there with the withdrawal." I regard this testimony as unimportant on the issue raised in this case, for these reasons: (1) The witness was obviously basing his statement on what he thought was the customary practice of the bank, for he admitted on cross-examination that he had no "knowledge of the withdrawals in this account other than the information gotten from the records of the bank," except as to the "closing check." Another witness for the bank, who had been its paying teller, was asked whether or not "your bank relaxed many of its rules with respect to both of them [Mr. and Mrs. Tribulas]." He replied, "No, I would not say that they did, *with possibly a couple of exceptions"* (italics supplied). This witness also admitted that "if Mr. Tribulas would

come with a check for Mrs. Tribulas, the bank would cash it." He added: "He was on record as being all right to cash for her." The fact is that this record is barren of any evidence of any authority ever being given by Mrs. Tribulas to her husband to cash checks for her. It was apparently this *assumption* on the part of the bank which caused the loss this depositor complains of.

(2) *The possession of this particular passbook did not give the possessor the right to make withdrawals from the account. This is one of the most important facts in this case.* Most banks do have a rule printed in the passbook providing that presentation of the passbook shall be prima facie evidence of the right of the presenter to withdraw funds. For example, in *Bulakowski v. Phila. Saving Fund Society,* supra, and quoted in the majority opinion, there was a rule in the passbook providing in effect that a person by presenting the passbook might give himself the status of the depositor. This court in that case said: "Possession of the bank book is, *under the deposit contract* [italics supplied], prima facie evidence of the right to draw on the fund it represents" and that "these rules are printed in the deposit or passbook; by accepting the book the depositor assents to the regulations and they become a part of the contract of deposit binding on both [bank and depositor] alike," citing *Burrill v. Dollar Savings Bank,* 92 Pa. 134. *If in the instant case there had been such a rule in the passbook* and plaintiff's husband or some one else had procured possession of the book and presented it at the bank and thereby had enabled himself to withdraw funds from the depositor's account, the bank would be relieved from liability, *but under the facts of the present case, with no such rule in the passbook, the debtor bank* paid out this *creditor's* money at its peril. It was under the duty of seeing to it that it paid the money to exactly the right person, to wit, the depositor. If A promises to pay B $1,000 and gives a note to B as evi-

dence of the indebtedness, and someone steals or finds the note, A cannot discharge his obligation to B by paying that "someone," unless by their contract it is stipulated that possession of the note will be prima facie proof of the right to collect it. In the instant case, A is the defendant bank, B is Mrs. Tribulas, the depositor, and the "someone" to whom the money was unquestionably paid was her husband. This payment to the husband did not discharge the obligation unless Mrs. Tribulas was present and authorized the payment by actually making the mark that the bank alleges is hers. *That is the fact* in issue, and the question was *for the jury*.

The conduct of Mrs. Tribulas when in 1931 she found her balance to be only $466.27 was before the jury merely as evidence. She claimed she "cried and fought" when she made the discovery that most of her money was gone, until she was told to "get out." Witness Cassidy was asked: "Did she raise [in 1931] any question about any additional money being due her from her account?" and he answered, "Not to my knowledge. Q. Did she leave the bank perfectly satisfied?" In reply to this he stated his conclusion: "Yes, sir." That was all for the jury.

Mrs. Tribulas' delay in bringing this suit was within her statutory rights and its legal significance, if any, was for the jury. This illiterate woman may not have brought this action sooner because of ignorance of her rights. She may have believed that her only recourse was against her husband. The law gives any creditor six years' time in which to bring an action against his or her debtor.

The trial court imposed too heavy a burden on the plaintiff (Mrs. Tribulas) by requiring her to prove that the bank failed to show ordinary care in paying these checks which she claimed were forged. This *would* be correct if the passbook contained a rule or contract that possession of the book gave the bank the right prima facie to pay him who presented the book, but in the ab-

sence of such a rule, it is not correct. In such a case the burden was on the *debtor* bank to prove it paid its indebtedness to its creditor depositor, as is shown by the authorities cited in this opinion.

However, the jury found that the plaintiff *had sustained* even the unwarranted burden of proof the trial judge placed on her, and found a verdict in her favor. The court in banc *erroneously,* in my judgment, applied the rule laid down in the *Bulakowski Case,* supra, which, *unlike this case, was a typical passbook case,* and held that plaintiff had not sustained the burden of proof imposed upon her and accordingly entered judgment for defendant n. o. v. *In this case the burden of proving payment was on the bank after plaintiff proved her deposits* (which were not disputed), and this burden the defendant wholly failed to meet.

I would hold that the judgment of the court below should be set aside and judgment entered for the plaintiff on the verdict, were it not for the fact that I do not think that the trial court sufficiently clarified the issues or reviewed the evidence or correctly defined the burden of proof. The last named subject was not referred to except when the court was asked to charge on "point number four." What the court there said about the burden of proving the bank's "failure to exercise ordinary care" being on the plaintiff, was erroneous, and while it was prejudicial to the plaintiff and not to the defendant, a jury which is confused as to where the burden of proof lies is quite likely to be confused as to the issue generally. We said recently in *Sears v. Birbeck,* 321 Pa. 375, 383, 184 A. 6: "It is a primary duty of the trial judge— a duty that must never be ignored—in charging a jury to clarify the issues so that the jury may comprehend the questions they are to decide. Such clarification is impossible without clear instruction as to the burden of proof, the shifting of the burden in certain states of the record, and if plaintiff has offered prima facie proof of

what he has pleaded, the duty then devolving on the defendant to come forward with evidence. See *Henes v. McGovern*, 317 Pa. 302, 176 A. 503." We also said in the same case in substance that it is the duty of the trial judge to review adequately the opposing evidence in a case and that "a trial judge's charges which are inadequate or not clear, or which tend to mislead are well recognized grounds for reversal" (citing cases).

I think that in the interest of a fair trial of the issues in this case a new trial should be granted even though plaintiff might feel that she is entitled to judgment on the verdict. This court has wide discretion in the matter of granting new trials in order "to minister justice to all persons": Act of June 16, 1836, P. L. 784. See *Com. v. Ragone*, 317 Pa. 113, 127, 176 A. 454.

At the new trial, plaintiff's claim should, in my judgment, be submitted to the jury, without the latter being "instructed" (as the majority opinion says they should be), "that on the admitted facts plaintiff by her silence during the periods specified had estopped herself from recovering for any items charged to her account prior to the last balancing of the book January, 1924." Whether there is an estoppel here at all depends upon disputed testimony. There is no factual situation here which warrants the trial court in giving binding instructions against the plaintiff *as to any part* of her claim. This case turns entirely on oral testimony and is therefore for the jury. See *Nanty-Glo Boro. v. American Surety Co.*, 309 Pa. 236, 163 A. 523; *Reel v. Elder*, 62 Pa. 308; and *Grambs v. Lynch*, 4 Pennypacker 243, 252.

Since the Statute of Limitations cannot run against a bank account and since there was in this case no "account stated," as this court and other courts have frequently defined an "account stated," I would deny defendant's motion to amend its affidavit of defense by setting up the Statute of Limitations.